JAMES J. HOLLAND, APPELLANT, VS. THOMAS O. HOLMES APPELLEE.

1. In every contract for the sale of lands, whatever may be the language in which it is couched, there is an implied undertaking to make a good title, unless such an obligation is expressly excluded by the terms of the agreement.

2. An offer to make a quit-claim deed, which conveys only vendor's interest, is not a compliance with an agreement to make title in a case where the chain of title upon the public records is defective and broken.

3. Where the judgment of the Court below is based upon the findings of a referee, an appeal brings these findings to this Court for review. They are to be treated here as the verdict of a jury, and unless they are against the evidence, this Court will not interfere. Where there are conflicts, the credibility of the witnesses will be left to the referee.

Appeal from the Circuit Court, Fourth Judicial Circuit, Duval County.

The opinion of the court contains a statement of the case.

*H. Bisbee, Jr.*, for Appellant.

*Call & Basnett* for Appellee.

WESTCOTT, J., delivered the opinion of the court.

This is an appeal from a judgment rendered in an action upon the case brought by Holland to recover of Holmes damages occasioned by alleged fraud and deceit upon the part of Holmes, in the matter of a sale to Holland of a house and lot in the city of Jacksonville, and for damages occasioned by the failure on the part of Holmes to perform his agreement of sale.

The referee found from the evidence as matter of fact, that the whole subject of this suit had been made a matter of negotiation and settlement by the parties, and that any and all damages resulting from the breach of the contract, or from the representation by the vendor that he had a good title, had been embraced in the settlement. With this finding of fact, the necessary conclusion of law was that the plaintiff's right of action had been destroyed by such settlement. Plaintiff excepted, and here insists that what transpired was a sale of property by Holland to Holmes ; that it was no settlement ; that his right of action for the deceit and his consequent damages were not mentioned ; that he had a right to recover damages occasioned by the assurance of Holmes that he had a good title ; that such representation was a false and fraudulent representation, and that he has done nothing by which his right of action or consequent damages have been compromised, adjusted or settled.

The first question which arises is, what is the effect to be given to the findings of the referee as to matters of fact in a case of this kind, where the judgment of the court is entered upon such findings, and the appeal is prosecuted from such judgment.

Under the Code these findings must be reviewed in like manner and with like effect in all respects as in cases of appeal where the trial has been by the court, and findings of fact by the court are sought to be reviewed. Sec. 218, 214, Code. What is the rule as to conclusions of fact found by

Holland v. Holmes.

the court when a review is sought here? Such "findings of fact are deemed conclusive unless they are without evidence in support of them or against an overwhelming weight of evidence." Voor. Code, 398, sec. 268. They should not be set aside as against the weight of evidence, unless the preponderance be so great that the verdict of a jury to the same effect on the same testimony would be set aside. How. Code, 410, 422, 423; 1 Sand., 457.

There can be no doubt that upon an appeal from a judgment of the Circuit Court, based upon the findings of a referee, his findings of fact may be reviewed in this court, although a different rule obtains in the Court of Appeals in New York.

We think the correct rule is that the findings of fact by a referee must be treated as the verdict of a jury in like cases. The referee found in this case that there was an adjustment and setlement of the matter embraced in this suit. Upon a careful examination of the testimony, is the finding of the referee upon this quection so plainly against the evidence that the judgment must be reversed and a new trial awarded? This is the general question presented by this record. This action arises from a breach of the following agreement:

JACKSONVILLE, FLORIDA, March 24, 1866.

$1,010

I have this day agreed to sell to J. J. Holland the house and lot in the town of Jacksonville, Florida, known as lot number six in square number forty-nine, for the sum of ten hundred and ten dollars, the title to be delivered so soon as the full amount shall be paid by said Holland. The said Holland to have occupation of the premises at the same rent of the present tenant, say twelve dollars per month, until full payment and titles are perfected in him, and for all money payments on the premises shall be entitled to a proportionate reduction of the rent that the payments bear to the value of the premises as stated above in the agreement of sale.

T. O. HOLMES.

Under this agreement Holland entered into possession. He made all the payments agreed to be made, and was clearly entitled to a performance by Holmes. He also made improvements of considerable value. He alleges that Holmes falsely and fraudulently represented that he, Holmes, had a good title. Holland was entitled to a good title under this agreement. The legal effect of this agreement was that the land should be conveyed by one having a good title, or full power to convey a good title. 1 Black. S. C., 455. In every contract for the sale of lands, whatever may be the language in which it is couched, there is an implied undertaking to make a good title, unless such an obligation is expressly excluded by the terms of the agreement. 25 N. Y., (5 Seld.) 543.

From the evidence it appears that the chain of title of the vendor here was not complete upon the public records. He claimed that he had lost one of the deeds and introduced witnesses endeavoring to establish its existence. He also claimed that his possession and that of those through whom he claimed was of such duration and of such nature as afforded good ground for him to believe that his title was good, and always asserted and now asserts that it is good. While there is a conflict in the authorities upon the general subject of the form of the conveyance which a party is entitled to under such a contract, (Hilliard on Vendors, 208 to 270,) yet the vendee, if he was willing to take any conveyance at all, here was entitled to something more than a simple quit claim deed, which was all that the vendor offered. 22 Conn., 513 ; 8 Eng., (Ark.) 422. The vendor had agreed to sell the land, to give a good title and not to execute a deed of whatever interest or title he had in it.

It is clear, therefore, that the vendor by his refusal to execute any other deed than a quit claim deed, violated his contract. It is also true, that if the vendor had no title and falsely and fraudulently represented that he had a good title as the vendee alleges, that he, the vendor, was liable to the

vendee in this action for fraud and deceit.  The vendee could not have recovered the price paid for the land and the value of his improvements, and at the same time have a right to retain possession, with the probability that he might never have been evicted.  Without proposing to announce any rule as to the measure of damages in a case of eviction where there has been fraudulent representations as to title, and only for the purpose of considering the finding of the referee, it may be admitted that the damages would have embraced the value of the improvements and other consequent damages.  This brief view of the rights of the parties under this contract will enable us to understand the effect and scope of their subsequent acts in reference to the transaction from which it is claimed resulted a settlement of the whole matter of difference between them.

Holland, in ignorance of the character of the deed which he took, accepted from Holmes a simple quit claim deed unaccompanied by a relinquishment of dower.  When he wished to have it recorded, he was informed that it was not a good deed and he was subsequently apprised by counsel that in his opinion there was a fatal and serious defect in the chain of title, so far as it appeared in the clerk's office of the county.

Holland having discovered this defect in the chain of title, and being advised that the quit claim deed was not such a deed as he was entitled to, sought legal advice as to his rights and caused the following letter to be written to Holmes :

JACKSONVILLE, FLORIDA, June 24, 1870.

Mr. THOS. O. HOLMES,

*Dear Sir*—It is necessary something immediate and definite should be done with regard to the title to the property sold by you to Mr. J. J. Holland.  We have examined the matter more fully and advise him, in view of the complications surrounding the title; and your indisposition to warrant the title, to propose to surrender the lot to you in the

Holland v. Holmes.

same condition in which he took possession of it on your paying him the purchase money and legal interest on it to date. If you do not accept this proposition or give Mr. Holland a warranty of the title on which he can recover if ejected, we shall be forced to file a bill against you this week.

Very truly, yours,

FLEMING & DANIEL, Att'ys, &c.

This letter was the commencement of the negotiation which ended finally in the alleged full settlement. The vendee alleges that what finally happened was nothing more than *a sale* by him of his interest. This letter did not result from any proposition to buy or sell the interest of the vendee. It was a statement of what he was willing to do in view of the " complications surrounding the title," and " the vendor's indisposition to warrant the title." It was a statement proposed to have been made after full examination by his attorneys. The terms complications surrounding the title, the matter of a warranty title, the improvements on the lot, and the purchase money, embrace the general subjects-matter which are the foundation of this suit. It is from these very things that the difference arises, and out of which his alleged damage arises. This letter is the beginning of the negotiations which followed.

The questions present themselves, was it a desire on the part of Holmes to purchase this property of Holland which occasioned this letter? Was it for the simple purpose of selling this property that Mr. Holland wrote it? It is plain that this was no proposition of a simple sale or purchase. Holland had paid a certain amount for the land and had built improvements. He here proposed to take what he had paid for the land, and after removing his improvements to restore the land as he found it to Holmes. This proposition was made by Holland upon the hypothesis that in any settlement he made with Holmes, he was entitled to the price he paid for the land and was also entitled to his improvements. In other words, to deal with him upon the hypothe-

sis that his title, whether good or bad, in fact was to be *viewed as good in any negotiation looking to a settlement with him.* Holland, when he thought he was getting a good title, valued the lot at ten hundred and ten dollars, and this sum he now demanded. He further demanded the right to remove his improvements, and he was to do nothing more than give up the lot in the same condition that he found it. To sum up the whole matter the proposition was thus: I have agreed to buy this property; I have paid for it. You agreed to sell and give me a warranty deed. You refuse to give me a warranty deed. You say the title you have is good, and that a quit claim deed which conveys your interest is a good title. I do not think you have a good title, and in view of the complications surrounding the title and your indisposition to warrant the title, I propose that you return me what I paid you, which was what I thought the land was worth with a good title and permit me to take the improvements I built, and I will restore you what I received—the lot. Holmes accepted the proposition but Holland withdrew it.

The next important thing which occurred which has a bearing upon the alleged final settlement of the whole subject-matter of difference between the parties, was at an interview in the office of Messrs. Fleming & Daniel, attorneys for Holland. At this interview a proposition was made looking to the purchase of one house on the south part of the lot by Holmes, and the surrender of the whole lot. It was agreed that Holmes was to give twenty-eight hundred dollars for the whole lot and the one house on the south part, and Holland was to pay ten dollars ground rent for the north part. Holmes accepted the offer and a day or so afterwards tendered the money. Messrs. Fleming & Daniel, to whom the tender was made, replied that Mr. Holland declined to fulfil the agreement and that they had withdrawn from his case. Mr. Daniel, one of the attorneys of Mr. Holland, makes this statement in his testimony in reference to

this negotiation : He says, when the conference was had relative to the twenty-eight hundred dollars to be paid by Mr. Holmes, I don't think that we *then* had any instructions from Mr. Holland to turn over to Mr. Holmes the agreement for sale except upon the consummation of the contract for twenty-eight hundred dollars. *My memory is that upon the consummation of this contract, there was to be a delivery of the papers.* Here again, we have a negotiation as to the whole subject-matter. This witness also states that Holmes asserted several times in this interview that he thought he was paying more than the property was worth. There were several interviews between the parties after this. No other person was present. The only testimony relating to these interviews and to the alleged settlement is that of the parties. It was as follows. The plaintiff testified as follows in reference to these interviews :

"The subject of the settlement of right of action for damages was never mentioned between myself and Mr. Holmes at any time. I agreed to quit claim what right I had in the property under the contract ; Mr. Biggs did not state to me that the heirs of Mary Darby had made a deed to him, Biggs. As to the contract being delivered up to Mr' Holmes, there was nothing said ; I left it with other papers in the hands of Mr. Graybill, the clerk of Fleming & Daniel, who had the other papers. I did not instruct Fleming & Daniel to deliver the contract to Mr. Holmes. I do not remember delivering the contract to Mr. Holmes. The contents of the letter of Fleming & Daniel to Holmes were known to me. I saw Mr. Holmes twice across the river in relation to the place. *Various things on different subjects were said. I went over to see him to settle with him on the best terms I could, being in his power, reserving my right as per advice to sue him for damages. So much transpired I cannot tell all that took place. I cannot tell what particularly I said.* I made the proposition as stated, to convey back my interest in the property to Mr. Holmes on

the best terms I could make with him. I accepted forty-five hundred dollars from Mr. Holmes, less the discount on his notes, for my interest and right in the premises as held under the contract. Damages and injuries were never mentioned between us. As to the contract being delivered up to Mr. Holmes there was nothing said. I left it with other papers in the hands of Mr. Graybill, the clerk of Fleming & Daniel, who had the other papers. I did not instruct Fleming & Daniel to deliver the contract to Mr. Holmes. I do not remember delivering the contract to Mr. Holmes."

The defendant testified thus : " Between the date of the abandonment of this last proposition by Mr. Holland and the 27th of July, 1870, Mr. Holland came to my house several times and importuned me to purchase the whole property. That it was difficult to remove the houses and settle the matter. I declined any other than the contract made with him; that I did not want the houses ; that I had sold to get rid of all these tenant houses. His price had always been from the beginning up to this time five thousand dollars for the whole property. The last time that he came we agreed upon an absolute and unconditional sale of the premises for forty-five hundred dollars, he stating that he would return my deed that was unrecorded, my contract of sale and all the papers in reference thereto, stating at the same time that the title was perfectly good in me, but from the want of the connecting link in the records he could not raise money upon it, which was his reason for selling me the whole property, including the insurance and everything connected with it, and he gave me a quit claim from himself and wife. This was upon the other side of the river. It was a final settlement and afterwards consummated according to agreement, and all the papers relinquished to me—my unrecorded deed, the leases, the insurance policies, contract of sale, and a quit claim deed made by him and his wife to me. I have paid the forty-five hundred dollars. It was a verbal contract. It was an unconditional settlement of the whole matter between

us in regard to lot 6, block 49. I said to Mr. Holland that it was more than the value of the property. I showed him a house that we were standing in front of, that was a great deal better than his houses, that I put up, and cost less money, and that if it was not for the trouble about this matter, that I would not give it for them. That but for this trouble I would not purchase at all at any price; that I did not want dwelling houses in Jacksonville, that I had been bothered with them for years which was my reason for selling them out. I don't remember that there was anything said about titles to this lot at the time of the agreement, except as to the claim of Mrs. Moody. I made him an offer to loan him money on his title at the same rate as Mr. Oakes would loan it, as I believed it was good; he had said something about Mr. Oakes not wanting to loan money on that title that he had. Mr. Biggs, the party from whom he, (Holmes,) obtained title, had been in possession of the property many years prior to the war, I think in 1855 or '56, and may have been earlier. No one asserted any claim to the property during my possession from 1858 or '59, as against the title of Mr. Biggs. I believe that Mr. Biggs had perfected the title from him. I do not remember positively. Upon payment of the forty-five hundred dollars to Mr. Holland, I received the deed I had given him, the original contract of sale, a deed from him and his wife, insurance policies, for which an additional sum was paid, the lease of Norton, the Remington deed and Moody assignment. Mr. Holland delivered the agreement. He and his agent, Mr. DaCosta, were sitting by, I think. I took it from his hand when he brought it. I asked for it particularly; Mr. Holland went out to get it. There was nothing said by either me or him at that time when the papers were delivered as to releasing any right of action for breach of contract. I went there merely to pay the money and receive the papers according to our final contract and settlement over the river, and the papers were returned to me as he had agreed to do."

Holland v. Holmes.

" *Question*—Was there anything said previous to that time about releasing plaintiff's right of action for damages ?

" *Answer*—Not in that language, but it was said in sub-stance that I was to have it absolutely and unconditionally. I swear to it positively. *Nothing was said in that language as to settling any damages; the purport of it was that it was to be a final settlement of the whole matter.* I cannot say whether the right of action for damages was mentioned in these words. We discussed the whole matter the last time he was over the river, and we settled the whole matter ; there were no reservations.

" *Question*—Did you or not testify on both of the former trials of this case that the subject of the right of action for damages for breach of contract was never mentioned between plaintiff and defendant ?

" *Answer*—I cannot remember, but I did not intend to say that the substance or subject of the question of damages was not settled in our final settlement.

" *Question*—Was the subject of the right of action for damages discussed at all by you and Mr. Holland ?

" *Answer*—The word damages or right of action, was not mentioned, but in various ways in substance it was ; all inju-ries were included. I don't think Mr. Holland used the word injuries, but he spoke of being injured, all these mat-ters were discussed. I never asked Mr. Holland to release rights of action for damages in these words. He proposed himself to make a final matter to end the matter in the sale of the whole property. I cannot recollect his exact words ; that was the substance as I have stated it in various conver-sations and our understanding and his, that it was a finality of the whole matter. In my conversations with Mr. Daniel I don't remember that the question of damages for breach of contract was spoken of, unless it is in that letter. There was nothing said about rights of action for damages when the $2,800 negotiation took place ; the subject of the conver-sation was that it was to be a finality of the whole matter :

this was the impression given me both by Col. Daniel and
Mr. Holland.   I stated to them that I was giving them three
hundred dollars more than its value, to close the whole mat-
ter, to have an end to it, or close the whole matters, that is
the meaning of it."

What is the result of this testimony ?   The plaintiff say$_s$
upon the direct examination that the subject of the settle-
ment of the right of action for damages was never mentioned
by him and defendant at any time, and that he agreed to
quit claim his interest in the property.   The defendant ad-
mits that the words, " the right of action for damages," were
never used, and he also states that one part of the understand-
ing was, that plaintiff was to give him a quit claim deed.   As
to delivery of the contract and the agreement in respect to
it, there is a direct conflict.   Upon the cross examination,
plaintiff, when asked to tell all that was said and done, re-
plied that " *various things on different subjects were said.   I
went over to see him to settle with him on the best terms I
could, being in his power, reserving my right as per advice
to sue him for damages.*"   The witness cannot mean by this
that he made any express statement to Holmes to this effect,
for both himself and Holmes testify that such words were
not used by them.   His obvious meaning is that he was si-
lent on the precise subject of the right of action for damages.
He continues, " *so much transpired I cannot tell all that took
place.   I cannot tell particularly what I said.*   Damages
and injuries were never mentioned between us."   There is
no necessary conflict here, as the defendant testifies that he
does not recollect the use of the word " injuries."   These
are all the necessary conflicts in this testimony.   The plain-
tiff admits that *so much transpired that he could not tell
what took place ; that various things on different subjects
took place, and that his purpose in going over to see defend-
ant, was to settle with him on the best terms he could ;*  adding
that he reserved his right to sue for damages, but this reser-
vation it is apparent was by silence.   The defendant gives

a general statement of the subjects discussed and says the understanding of both of the parties was that this was a final settlement of the whole matter.   If it be admitted that there was something more than a simple breach of contract here, and that the circumstances would have entitled the plaintiff to have sought a court of equity to rescind the contract, and that he might have recovered the purchase money with the value of improvements, we see that both of these elements necessarily entered into this settlement.   We thus see that the damages resulting from the breach of the contract and the alleged fraudulent representations, to-wit: the purchase money and the improvements, were matters necessarily embraced in this settlement, and it is immaterial whether the word " damages " or the words " right of action," were used or not; the settlement embraced them to this extent at all events.   That Holland did not in this transaction get all of the damages which he might have recovered in an action at law, cannot justify the setting aside of a settlement of the whole subject-matter and difference between the parties. The referee found his facts in accordance with the testimony of Holmes, and the natural conclusion which followed from all of the transactions between the parties.

Two persons who were jurors in a former trial were introduced to impeach the testimony of Holmes.   They were asked " whether he did not then testify that the subject of the right of action for damages for breach of contract was never mentioned between plaintiff and defendant."   They replied, " He did say they were not mentioned, but he said when he paid the money to Mr. Holland he supposed it was a full settlement."   This is what Holmes now testifies substantially.

It was also attempted to impeach Holmes' testimony by proving that he had made a statement to the witness Daniel that was untrue.   This witness testifies that Holmes in one of his negotiations with him as the attorney of Holland, said that " he had given a quit claim deed, and that was the kind

of deed he always gave, and that he considered it sufficient." The records of the clerk's office show that he as a general rule gave warranty deeds. This is not the proper method of impeaching this witness. He should have been asked whether he ever made such a statement. He would then have had an opportunity of making an explanation under oath of his statement not under oath. If, however, Holmes had been asked this question and had testified that he made no such statement, it would have raised a question of credibility, which the referee is the proper party to settle. These witnesses are before him, he sees them; this court has universally refused to decide questions of credibility.

Taking an impartial and fair view of the whole testimony, we cannot say that the finding of the referee was against the evidence.

Judgment affirmed.